[Cite as *Zager v. Johnson Controls, Inc.*, 2014-Ohio-3998.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY


| | | |
|---|---|---|
| CAROLINA ZAGER, et al., | : | |
| Plaintiffs-Appellants, | : | CASE NO. CA2014-01-016 |
| - vs - | : | O P I N I O N<br>9/15/2014 |
| | : | |
| JOHNSON CONTROLS, INC., et al., | : | |
| Defendants-Appellees. | : | |


CIVIL APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
Case No. CV2009-10-4487


The Moore Law Firm, Daniel N. Moore, Donald C. Moore, Jr., Derrick A. Wyatt, 1060 Nimitzview Drive, Suite 200, Cincinnati, Ohio 45230; Paul W. Flowers Co., L.P.A., Paul W. Flowers, Terminal Tower, 35th Floor, 50 Public Square, Cleveland, Ohio 44113; and Sean C. Domnick, 11701 Lake Victoria Gardens Avenue, Suite 3201, Palm Beach Gardens, FL 33410-2765, for plaintiffs-appellants

Dinsmore & Shohl, LLP, Gregory A. Harrison, Jeffrey P. Hinebaugh, Scott Everett, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202 and Reed Smith LLP, Richard K. Wray, Casey L. Westover, 10 South Wacker Drive, 40th Floor, Chicago, IL 60606,, for defendant-appellee, Johnson Controls, Inc.

Gary F. Franke, 120 East Fourth Street, Suite 1040, Cincinnati, Ohio 45202, for defendant-appellee, Eagle Motors of Hamilton, Inc.


**PIPER, J.**

{¶ 1} Plaintiffs-appellants, Carolina Zager, individually and as next friend of her son,

Cayden Hatton, a minor, appeal from a decision of the Butler County Court of Common Pleas

granting summary judgment in favor of defendant-appellee, Johnson Controls, Inc. (JCI).[1]

For the reasons discussed below, we affirm the decision of the trial court.

## I. Facts

{¶ 2}   On January 2, 2009, Zager was a backseat passenger in a 1999 Chrysler 300M (300M) traveling along I-75 in Sarasota, Florida.  Zager and three of her friends, including Christopher Sheldon, were driving towards Cincinnati after watching the University of Cincinnati play in the Orange Bowl.  Sheldon was operating the 300M.  He fell asleep behind the wheel, causing the vehicle to drift out of the lane and strike a construction barrier head-on.  At the time of the collision, a cooler weighing approximately 50 pounds was in the trunk.[2] Upon impact, the cooler struck the rear seatback, breaching the seatback and allegedly caused Zager's body to rotate out of the protection of the shoulder seat belt while her head and torso bent over the lap belt.  As a result of this collision, Zager sustained serious injuries leaving her a paraplegic.  The other occupants of the vehicle were able to exit the vehicle under their own power and were released from the hospital that same day with only minor injuries.

{¶ 3}   On October 12, 2009, appellants filed a personal injury products liability action against JCI, the manufacturer of the rear seat of the 300M.[3]  In the complaint, appellants alleged the seat and the luggage compartment of the 300M both failed, and as a result of such failure Zager sustained severe injuries.  Appellants asserted several claims including claims for manufacturer liability and loss of parental consortium.  Appellants specifically

---

1. Since the filing of this lawsuit, Zager has married and changed her name to Carolina Hatton.  For ease of discussion, we refer to her as Zager throughout this opinion.

2. A placard on the car stated that the weight capacity for the trunk was 115 pounds.

3. Appellants also filed claims against Sheldon, Eagle Motors of Hamilton, Inc., and Goodyear Tire and Rubber Company.  These parties are not parties to the present appeal.  Appellants also filed a second lawsuit against Chrysler in Florida state court.

claimed that JCI was liable for appellants' injuries as "the subject vehicle or a component thereof" was defective in design, pursuant to R.C. 2307.75, or defective due to inadequate warning pursuant to R.C. 2307.76.

## A. JCI's Development of the Rear Seat

{¶ 4} The rear seat cushion and the rear seatback of the 300M were designed pursuant to Chrysler's specifications and manufactured by JCI for Chrysler's assembly of the seat into the vehicle. In the 300M, Chrysler requested the rear bench seat be a folding seat arranged in a 60/40 split configuration, with 60 percent of the rear folding seat on the driver side and the remaining 40 percent on the passenger side. The seatback is a pass-through seatback, meaning both portions of the rear seatback can fold down horizontally to permit items from the trunk to pass through into the vehicle interior, creating more cargo space. The surface of the rear seatback panels were made of plastic. The 1999 300M was part of Chrysler's LH platform of vehicles. At the outset of the project, Chrysler selected JCI as the seat supplier and JCI began work on the seats in early 1994.[4] The relationship between Chrysler and JCI, as an outside component part supplier, was defined by a series of documents, including, but not limited to Chrysler's Outside Designed and Developed process specification, PS-7000. Chrysler also provided JCI with a Statement of Work (SOW) which basically outlined the agreement between the two companies for the production of the seat. More specifically, the SOW "act[ed] as a guiding document" and included Chrysler's requested content, features, and specifications for the seat. The statement of work also outlined the various testing procedures and requirements for the seat and designated which of the two companies would perform such tests. Furthermore, as outlined in PF-8401, a

---

4. JCI manufactured both the front and rear seats for the LH program pursuant to Chrysler's specifications. However, as this case deals only with the rear seat, our discussion will be limited to the rear seat.

specifications document, Chrysler provided JCI with a set of performance standards for the seat, including the required strength of the seat.

{¶ 5} In the SOW, Chrysler requested that the seat be a folding back modular design similar to the 1994 PL body, which was used in a smaller platform of vehicles like the Neon. Essentially, Chrysler requested JCI produce a design similar to the PL body that would fit in the LH body. The rear seatbacks for the PL body were also a 60/40 split configuration and made of plastic. After receiving the SOW, JCI began designing the seat system. During the design process, there were design reviews, internally with JCI engineers and jointly with Chrysler engineers. These periodic meetings were held to ensure JCI was meeting Chrysler's requirements from a fit, form, function, and safety standpoint. During these joint meetings, Chrysler and JCI engineers would discuss Design Failure Mode and Effects Analysis (DFMEA) reports. DFMEAs note each potential failure mode of the seating system, determines the effect of such failure modes, and rates the failure modes according to the risk of potential injury to a passenger. Pursuant to the SOW, JCI was required to submit all DFMEAs to Chrysler. In addition, JCI was required to conduct design verification and production verification testing reports to ensure that the seat continued to meet Chrysler's specifications. Once all testing was complete, and JCI demonstrated the seat met all the specifications, Chrysler approved the product and production on the seat began.

{¶ 6} JCI shipped the seating system to Chrysler for integration into the vehicle. The system included the rear seat cushion assembly, which included the wire frame structure, the foam pad, and trim cover. The seating system also included the rear seatback assembly, which included the collar, the two plastic panels, and the metal components of the assembly, such as the latches, crossbar, and fasteners. The fasteners attached the 60/40 panels to the collar and the collar attached the seat to the body of the vehicle. Specifically, there are five attachment locations for the rear seatback including the lower outboard pivot (found at the

bottom of the seatbacks near each door), the lower inboard pivot (shared between the two seatbacks in the bottom-middle of the seatbacks), and the upper outboard latch (the top of the seatbacks near each door). The two portions of the rear seatbacks were connected by a one-to-two-inch pin with a push nut placed over the pin on the 40 percent side acting as a retention clip. The rear seatback collar is attached to three tabs on the bulkhead with three matching brackets bolted to the rear seat collar.

{¶ 7} According to appellants, the rear seatback was defective as it failed to provide adequate cargo retention. Specifically, appellants contend the rear seatback failed when the cooler in the vehicle's trunk smashed into the seatback which failed to absorb the impact, allowing the cooler to enter the rear passenger area unimpeded. Appellants assert that the pin which connected the 60/40 seats "broke apart, causing the seat segments to swing open like a gate. The failure of the seat forced [Zager's] body to rotate out of the protection of her shoulder belt" ultimately causing her injuries.

### B. Motion for Summary Judgment

{¶ 8} After extensive discovery, JCI moved for summary judgment, asserting it was entitled to judgment as a matter of law. The trial court agreed, finding there was insufficient evidence to establish that the rear seat contained a defect as defined by R.C. 2307.74 – 2307.77. Moreover, the trial court found that JCI could not face liability, under the component parts doctrine, as the record did not support a conclusion that JCI participated in or controlled the design or the creation of the specifications for the seat, but rather it was Chrysler who made all determinations as to what specifications were necessary. Appellants timely appeal, raising one assignment of error for our review:

{¶ 9} THE TRIAL JUDGE ERRED, AS A MATTER OF LAW, BY GRANTING SUMMARY JUDGMENT AGAINST PLAINTIFF[S]-APPELLANTS UPON THEIR STATUTORY PRODUCTS LIABILITY CLAIMS.

## II. Analysis

{¶ 10} In their sole assignment of error, appellants argue the trial court erred in granting summary judgment in favor of JCI. Specifically, appellants argue the trial court erred in: (1) relying on the contract between the parties to resolve the question of whether JCI should face any liability for Zager's injuries; (2) finding appellants failed to establish a genuine issue of material fact as to whether the rear seatback was defective in its design under R.C. 2307.75 or whether it was defective for failure to provide adequate warning and instructions under R.C. 2307.76; and (3) applying the component parts doctrine. Appellants further assert that even if this court finds the component parts doctrine applicable, they presented sufficient evidence to impose liability to JCI as the seat itself was defective, both in its design and failure to include a proper warning, and because they presented evidence that JCI substantially participated in the design of the final product, the 300M.

### A. Standard of Review

{¶ 11} This court's review of a trial court's ruling on a summary judgment motion is de novo. *Mezger v. Horton*, 12th Dist. Brown, No. CA2012-12-023, 2013-Ohio-2964, ¶ 6. Civ.R. 56 sets forth the summary judgment standard and requires that there be no genuine issues of material fact to be litigated, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to only one conclusion and that conclusion is adverse to the nonmoving party. *Slowey v. Midland Acres, Inc.*, 12th Dist. Fayette No. CA2007-08-030, 2008-Ohio-3077, ¶ 8. The moving party has the burden of demonstrating that there is no genuine issue of material fact. *Horton* at ¶ 6, citing *Harless v. Willis Day Warehousing Co.,* 54 Ohio St.2d 64 (1978).

{¶ 12} Once the party moving for summary judgment satisfies its initial burden, the nonmoving party "may not rest on the mere allegations of his pleading, but his response, by affidavit or otherwise provided in Civ.R. 56, must set forth specific facts showing the

existence of a genuine triable issue." *Horton* at ¶ 7, quoting *Mootispaw v. Eckstein*, 76 Ohio St.3d 383, 385 (1996). The nonmoving party is entitled to have the evidence construed most strongly in its favor. *Slowey* at ¶ 8.

## B. R.C. 2307.71 and the Component Parts Doctrine

{¶ 13} As an initial matter, we must address appellants' claim that the component parts doctrine did not survive the passing of the 2005 amendments to R.C. 2307.71 et seq. Appellants assert that because R.C. 2307.71(B) specifically states "Sections 2307.71 to 2307.80 of the Revised Code are intended to abrogate all common law product liability claims or causes of action," the legislature similarly intended to abrogate all common law defenses. We find no merit to this argument.

{¶ 14} As we recently observed, "[a]lthough the Supreme Court of Ohio * * * initially adopted the component parts doctrine in the context of common law failure to warn claims, it has also been applied to statutory product liability claims." *Romans v. Texas Instruments, Inc.*, 12th Dist. Madison No. CA2013-04-012, 2013-Ohio-5089, ¶ 28, *appeal not accepted*, 138 Ohio St.3d 1451, 2014-Ohio-1182. Moreover, there is no repeal of the common law by mere implication. *Carrel v. Allied Prods. Corp.*, 78 Ohio St.3d 284, 287 (1997), *overruled on other grounds due to legislative action*. "[I]n the absence of language clearly showing the intention to supersede the common law, the existing common law is not affected by the statute, but continues in full force." *Id.*, quoting *Frantz v. Maher*, 106 Ohio App. 465, 472 (2d Dist.1957). The express language of R.C. 2307.71(B) only abrogates the "common law product liability *claims or causes of action*." (Emphasis added.) We will not infer that the Legislature intended to also abrogate the common law defenses unless specifically stated. Accordingly, as there is no language within R.C. 2307.71 to R.C. 2307.80 which clearly indicates an intention to supersede the component parts doctrine, it continues to be the law in Ohio.

## C. Contract

{¶ 15} Appellants also assert the trial court erred by holding that the extent of JCI's duties "turn[ed] solely upon [its] contractual responsibilities." Appellants contend the trial court erred in granting summary judgment to JCI as the court relied on JCI's compliance with Chrysler's contract terms in determining JCI was not liable. Appellants contend the court should have applied statutory law, specifically R.C. Chapter 2307.

{¶ 16} Having reviewed the trial court's decision, we find that although the trial court stated JCI's duty turned "solely upon contractual responsibility," the trial court did not rely on the contract alone as the sole basis for its decision. Rather, the trial court's statement merely reflected its acknowledgment that JCI, as a component part supplier for the 300M, was only responsible for the work it agreed to complete. We find no error in the trial court's reference to the contract as the court went on to consider JCI's liability under the component parts doctrine and whether JCI's seat contained a defect as defined in R.C. 2307.75 and R.C. 2307.76. The basis of the trial court's decision to grant summary judgment was, therefore, the component parts doctrine. We now address the propriety of the trial court's reliance on the component parts doctrine.

## D. Component Parts Doctrine

{¶ 17} Under the component parts doctrine, a manufacturer of a component part is not liable for a defect in a completed product unless: (1) the component itself is defective or dangerous, or (2) the component manufacturer constructs or assembles the completed product or substantially participated in the design of the final completed product. *Romans*, 2013-Ohio-5089 at ¶ 28; *see also Wells v. Komatsu Am. Internatl. Co.*, 1st Dist. Hamilton No. C-040089, 2005-Ohio-4415, ¶ 12; *Aldridge v. Reckhart Equip. Co.*, 4th Dist. Gallia No. 04CA17, 2006-Ohio-4964, ¶ 69-71; *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 271-271 (1993); *Temple v. Wean United Inc.*, 50 Ohio St.2d 317 (1977), paragraph four of

the syllabus.

{¶ 18} Appellants first contend that the component parts doctrine does not apply because they never argued that the completed product, the 300M was defective. Rather, their claims have been about the rear seating system.[5] Moreover, appellants argue that even if we found the component parts doctrine applicable to this case, JCI is not shielded from liability because the rear seat itself was dangerous and defective, and because JCI "substantially participated" in the design of the 300M.

## 1. The defective product

{¶ 19} Appellants contend the component parts doctrine is inapplicable because they have never claimed that the end product, the 300M was defective. Rather, appellants assert that they have always maintained that the rear seatback, although a part of the 300M, is the defective product. Appellants further argue that because JCI meets the definition of a "manufacturer" under R.C. 2307.71(A)(9), it is not entitled to more favorable treatment merely because it produced a component, rather than the finished product. Appellants assert that as a manufacturer, JCI is subject to the same duties and responsibilities set forth in Chapter 2307 that apply to all other manufacturers.

{¶ 20} Appellants are correct; JCI indeed falls within the definition of a manufacturer under R.C. 2307.71(A)(9) and is therefore subject to the provisions set forth in R.C. 2307 et. seq.[6] However, appellants' argument fails to recognize that the claimed defective product, a rear seatback which has inadequate cargo retention, relates to the operation of the final assembled vehicle. At its core, appellants' argument is that a component product, JCI's rear seatback, caused harm upon its integration into the end product or system. Appellants'

---

5. Appellants' complaint initiating this suit against JCI, however, does allege the vehicle is defective.

6. "'Manufacturer' means a person engaged in a business to design, formulate, produce, create, make, construct, assemble, or rebuild a product or a component of a product." R.C. 2307.71(A)(9).

complaints with the rear seat only resulted once it was integrated into the 300M. In fact, appellants specifically state at the end of their brief that "the integration of JCI's seating system caused the rear seatbacks to be defective." If the product was merely a seat unattached to a vehicle, it would be impossible for the lack of cargo retention, the defect appellants now complain of, to exist. Rather, it was only once JCI's seat was integrated into the 300M that it potentially became dangerous. Accordingly, as the defect complained of only arises in the completed product, we find the component parts doctrine indeed applies to the present case.

### 2. The rear seatback was not defective or dangerous

{¶ 21} As mentioned above, in order to overcome the component parts doctrine and impose liability upon JCI, appellants must establish that the rear seatback itself was defective.

{¶ 22} Under the product liability statutes, a product may be defective (1) in manufacture or construction, (2) in design or formulation, (3) due to inadequate warning or instruction, or (4) because the product does not conform to the manufacturer's representations. *See* R.C. 2307.74 to 2307.77. Appellants maintain the rear seatback was defective in two respects, in its design and for its failure to provide adequate warnings.

### a. Design defect

{¶ 23} Appellants assert that JCI should be held liable for Zager's injuries as the rear seatback contained a design defect. Specifically, appellants contend JCI's seatback was defective as it failed to provide adequate cargo retention.

{¶ 24} A product contains a design defect, if at the time it left the control of its manufacturer, the foreseeable risks associated with the product's design exceeded the benefits of the design. R.C. 2307.75(A). R.C. 2307.75(B) and (C) provides a list of factors to determine the foreseeable risks and benefits associated with the product's design. In

determining a product's foreseeable risks, some of the factors to be considered include: (1) the nature and magnitude of the risks of harm associated with that design in light of the intended and reasonably foreseeable uses; (2) the likely awareness of product users, whether based on warnings, general knowledge, or otherwise, of those risks of harm; (3) the likelihood that the design would cause harm in light of the intended and reasonably foreseeable uses; (4) the extent to which the design conformed to any applicable public or private product standard that was in effect when the product left the control of its manufacturer; (5) the extent to which the design is more dangerous than a reasonably prudent consumer would expect. R.C. 2307.75(B)(1) – (5). In assessing the benefits associated with the design or formulation of a product, factors such as the following should be considered: (1) the intended utility of the product, including any safety advantages associated with the design; (2) the technical and economic feasibility of an alternative design; and (3) any foreseeable risks associated with the alternative design. R.C. 2307.75(C)(1) – (3).

{¶ 25} Without specifically referring to the statutory factors listed in R.C. 2307.75, appellants generally assert that the benefits of JCI's "flimsy design" did not outweigh the risk of harm to vehicle occupants "due to a structural failure in a routine front-end impact." According to appellants, JCI failed to meet its obligations when it ignored the foreseeable harm that could occur in front-end collisions and designed the seatback without ensuring that it provided adequate cargo retention. Appellants assert that such harm was foreseeable to JCI in light of its knowledge that: (1) the opening of the bulkhead was maximized in order to provide increased cargo space; (2) the rear seatback was the only barrier between occupants and trunk cargo, and (3) the seatback would fail in the manner it did in Zager's accident. Appellants point to the following design decisions which they maintain rendered the seatback defective: (1) to use split rear seats without a latch connecting the upper inboard portion of

those seats to the metal collar and (2) to use a pivot pin with the push nut as a fastener. According to appellants' mechanical engineer expert, Stephen Forrest, each of these design decisions permitted the seat to "gate open" during the accident causing Zager to come out of her shoulder belt, which ultimately caused her injuries. Forest further opined that had this seatback complied with Europe's standard for cargo retention, ECE-17, the seat would not have been defective.[7] In alleging a design defect, appellants submitted several alternative designs for the rear seatback, its attachments, the bulkhead, and the trunk area which they argue would have prevented Zager's unfortunate injuries.

{¶ 26} After a thorough review of the record, we find that the undisputed evidence does not support appellants' claims. Although it appears from the record that JCI was aware its seat was the only barrier between the passengers and truck cargo and that it was potentially foreseeable that cargo may enter the occupant area upon impact of the rear seatback, the record is clear that Chrysler was responsible for all safety-related decisions, as well as decisions related to the cargo retention system of the 300M. Chrysler certainly could have delegated this responsibility to JCI to design a seat which provided adequate cargo retention, but Chrysler simply did not do that. JCI had no control over, or the responsibility for, the manner in which Chrysler provided for cargo retention within the 300M.

{¶ 27} At the outset of JCI and Chrysler's relationship, it was clear that Chrysler retained responsibility for all safety-related decisions. Several documents submitted by the parties reflect this aspect of the relationship between JCI and Chrysler. For instance, the Outside Designed and Developed [ODD Box] Items, defined the business relationship between Chrysler and JCI, as a supplier of a component part. The ODD states; "[Chrysler] Engineering shall make known the safety and regulatory requirements to the supplier and the

---

7. The record demonstrates that ECE-17 became effective in Europe for new vehicles in 2000 and for continuing vehicles in 2002, which was after this seat was produced.

supplier shall assure such requirements are incorporated into their products." According to Alan Barrett, the manager of seats and trim at Chrysler, the strength and safety requirements for seats were communicated by Chrysler to JCI through written specifications in a series of documents, one of which included PF-8401. Pursuant to the SOW, JCI was then required to demonstrate the seat's compliance with the specifications through a series of tests.

{¶ 28} This relationship structure is typical among car manufactures and their component part suppliers. As explained by William Tighe, the Director of Engineering Analysis for JCI: "All car companies reserve all the safety decision making, all the safety methods to themselves. It's too important and can only be done at the vehicle level." James Siegrist, the lead engineer of the LH seat, similarly stated, "JCI * * * is not a supplier of full vehicles. We are a supplier of one component that goes into that vehicle. The OEMs are responsible for assessing the overall safety of that vehicle relative to the federal requirements."[8] Siegrist further elaborated that the government provides a system of full vehicle test requirements referred to as the Federal Motor Vehicle Safety Standards (FMVSS). The OEMs then take those requirements, interpret them, and "determine what component level test the seat needs to meet in order to be a part of that greater system and then ultimately the OEMs are responsible for ensuring they meet the federal requirements." Barrett further testified that the minimum strength requirement for a safe seat was initially determined by the government in the FMVSS and then expanded by Chrysler in PF-8401. Barrett stated that Chrysler considered a seat safe, including crashworthy, if it met PF-8401's strength requirements. Accordingly, it is clear that Chrysler controlled and set all the safety parameters for not only components of its vehicles, such as the rear seat at issue in this case, but also for the vehicle itself.

---

8. Original Equipment Manufacturer (OEMs) refers to the vehicle manufacturer.

{¶ 29} Moreover, it is undisputed that JCI did not have knowledge of system level parameters of the vehicle which were irrelevant to JCI's role in executing Chrysler's requirements for the seat.  For instance, JCI was unaware that the luggage capacity for the 300M was 115 pounds.   As explained by Tighe, "[Chrysler] tends to keep us compartmentalized.  They don't want us knowing too much about what's going in other parts of the vehicle for competitive reasons."  Tighe further added that cargo retention decisions were made by the vehicle manufacturer because such a decision is about the "vehicle architecture."  According to Tighe, vehicle manufacturers may delegate the execution of some of these tasks to suppliers, but it's not a decision the supplier makes on its own.  In addition, Chrysler did a variety of testing on the vehicle as assembled.  It is undisputed that JCI did not have the ability to test its seat once assembled into the vehicle.  At the time Zager's 300M was designed and produced, Chrysler conducted all the crash and impact simulated testing on completed vehicles.

{¶ 30} Most importantly however, the record reveals that nothing in the specifications as found in the SOW or in the testing requirements indicated that cargo retention was a requirement of the LH seat.  Chrysler's employee, Barrett, confirmed that Chrysler did not rely on JCI to provide cargo retention.  Moreover, the record indicates that cargo retention was not a government or industry requirement at the time Zager's 300M was designed and manufactured.  The record indicates that the industry, including JCI and Chrysler, simply were unaware of the risk passengers may be injured due to a lack of cargo retention.  In fact, the record reveals that even after this vehicle was manufactured and designed, the National Highway Transportation Safety Administration (NHTSA) denied a petition requesting a requirement for cargo retention be enacted in the United States.  In denying the petition, the NHSTA found a lack of safety need as reflected in the data from field accidents for such a requirement.

{¶ 31} The fact remains that JCI's rear seatback met all private and United States government requirements and regulations effective at the time the seat was designed and produced. More specifically, it is undisputed that JCI's rear seatback met each of Chrysler's specifications and testing requirements. In particular, Barrett testified that there was a "load requirement for those seat backs [sic] which relates to a pull test that JCI had done for the seat strength. And * * * it exceeded that quite healthily."

{¶ 32} Even though there was no requirement from Chrysler or from the government that JCI's rear seatback provide for cargo retention, in arguing the seatback was defective in its design, appellants rely on ECE-17 and assert that the seatback was defective for failing to comply with ECE-17's standard for cargo retention. According to Forrest, in order to be compliant with ECE-17, a rear seatback must be able to withstand 2,500 foot-pounds of energy and maintain separation from cargo. Forrest testified Zager's accident produced 700 foot-pounds of energy and therefore failed to meet the ECE-17 standard. Although the rear seatback at issue in this case may have arguably failed to meet the ECE-17 standard, this has no bearing on the fact that JCI's rear seat met all private and government requirements and regulations effective at the time the seat left JCI's control.

{¶ 33} Finally, although appellants are correct that JCI made certain design decisions with regards to the seatback, including the use of the push nut and the placement of the upper inboard latch, JCI was not responsible for making decisions for the purposes of cargo retention. As noted above, Chrysler was responsible for making such decisions and did not rely on JCI to provide for a method of cargo retention in the 300M. As acknowledge by Forrest, appellant's own expert, Chrysler could have selected alternative designs within the vehicle for cargo retention, including using the bulkhead to create the necessary structural separation between objects in the trunk and occupants. According to Forrest, if the bulkhead would have provided cargo retention, then the seatback would not have been defective. He

agreed, that in order for there to be no defect, "there has to be some system of things that exist in the design of this vehicle that keeps cargo in the trunk." Forrest's testimony makes clear that the defect occurs due to the manner in which the seat is integrated into the vehicle. The integration of the seat into the vehicle and the system of cargo retention for the 300M were the responsibility of Chrysler.

{¶ 34} Based on the contractual relationship between JCI and Chrysler, JCI was required to design, develop, and manufacture a rear seatback which met Chrysler's requirements and specifications. It is undisputed that JCI met or exceeded each of the specifications and requirements set by Chrysler. Based on this record, the seatback was not defective at the time it left JCI's control. Accordingly, we find appellants failed to present a genuine issue of material fact as to its claim that the rear seat was defective in its design due to the seat's failure to retain cargo in the trunk area.

### b. Defect due to Inadequate Warnings

{¶ 35} Appellants also assert the rear seatback was defective due to inadequate warnings. Specifically, appellants claim that JCI's rear seatback was ineffective as it failed to include a warning that its seatback would not retain cargo. Appellants argue that such a warning was necessary given JCI's knowledge that there was "a potential under the current design for luggage to intrude into the occupant area."

{¶ 36} Pursuant to R.C. 2307.76(A)(1), a product is defective due to inadequate warnings if, when it left the control of its manufacturer, both of the following applied:

> (a) The manufacturer knew or, in the exercise of reasonable care, should have known about a risk that is associated with the product and that allegedly caused harm for which the claimant seeks to recover compensatory damages;
>
> (b) The manufacturer failed to provide the warning or instruction that a manufacturer exercising reasonable care would have provided concerning that risk, in light of the likelihood that the product would cause harm of the type for which the claimant

seeks to recover compensatory damages and in light of the likely seriousness of that harm.

R.C. 2307.76(A)(1)(a) and (b). This duty applies at the time of marketing and continues after the product is sold. R.C. 2307.76(A)(1) and (2).

{¶ 37} Although a manufacturer is subject to potential liability based on a failure to warn under R.C. 2307.76, pursuant to the component parts doctrine, a component manufacturer's duty to warn does not extend "to the speculative anticipation of how manufactured components * * * can become potentially dangerous dependent upon their integration into a unit designed and assembled by another." *Romans*, 2013-Ohio-5089 at ¶ 46, quoting *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317 (1977), paragraph four of the syllabus. Moreover, a component part manufacturer is not required to "procure plans of the entire system, review those plans, and independently determine whether their respective component parts would function in a safe fashion." *Searls v. Doe*, 29 Ohio App.3d 309, 312 (10th Dist.1986).

{¶ 38} Appellants point to Deposition Exhibit 96 to support their contention that JCI was aware that its rear seatback would not protect rear seat passengers in the event of a collision. Exhibit 96 is a 1996 Design Failure Mode Effects and Analysis (DFMEA) report which contains undated handwritten notes. DFMEAs are documents created by JCI in which the engineers record potential failure modes of a system, here the seating system, analyze the failure modes to determine the effect thereof on the system, and then classify each potential failure mode according to its severity. The severity rating relates to the possible injury of passengers and is rated on a scale from one to ten. The handwritten notations on Exhibit 96 indicate that a function of the rear seat was to provide a "barrier to luggage area." As a potential failure mode, the document states "cracks under impact of luggage." The document further notes that the effect of such a failure is that it "allows luggage into occupant

area."  There is no severity rating for this failure mode.  Yet, a recommended action is included and states, "add sheet of material to panel."  Appellants contend that based on Exhibit 96, JCI was required to warn the end consumer of this risk and its failure to do so rendered the rear seatback defective due to inadequate warnings.

{¶ 39} Having reviewed the testimony and evidence submitted by the parties, it is apparent that the date of when this handwritten notation was made and whether it was made before this vehicle was manufactured is unclear.  Yet, we do not find that this creates a genuine issue of material fact requiring reversal of summary judgment.  Even assuming this document demonstrates JCI's knowledge that its seat failed to serve as a barrier, we find JCI did not have a duty to provide a warning to end users that the seat would not provide cargo retention.

{¶ 40} As an initial matter, the record reflects that JCI had no ability to communicate with the ultimate consumer, which includes providing any type of warning.  Tighe explained that warnings are provided "by the car companies, whether its the owner manual or the other labels in the vehicle, [these] are the responsibility of the car companies, the car makers. They have the expertise and the knowledge for the applications."  Moreover, Forrest confirmed that the owner's manual was written by Chrysler.  Appellants have failed to point to any other evidence in the record which contradicts Tighe's testimony that warnings are the responsibility of the car companies or that JCI had means to communicate with the end user. The record demonstrates that JCI did not have control over, or knowledge of, what was contained in the owner's manual or the content of any warning labels on the vehicle.  Based on the foregoing, it was Chrysler who controlled the warnings and communicated such warnings to the ultimate consumer.

{¶ 41} Moreover, the record is clear that Chrysler could have chosen several methods of cargo retention which had nothing to do with the rear seatbacks.  Even if Chrysler had

made such changes to provide for cargo retention, JCI would not have been aware of these changes. Chrysler could have chosen to include an additional warning on the trunk that all cargo should be restrained, however, it chose not to do so. JCI cannot be held liable for a decision made by Chrysler. As recognized by the First District, "the Ohio legislature has not placed a duty to warn on the manufacturer of a non-defective component part of an integrated product" that becomes dangerous upon integration. *Roberts* at ¶ 27, citing R.C. 2307.76.

{¶ 42} Furthermore, appellants' arguments with regard to JCI's failure to provide warnings to the ultimate consumers of the 300M are based upon the assumption that JCI was obligated to independently test or inspect the 300M or request design changes from Chrysler to ensure the vehicle had an adequate cargo retention system. However, contrary to appellants' contentions, JCI was not required to make an independent determination of, or to verify the safety of its rear seat once installed into a completed 300M. A component part manufacturer is "not required to procure plans of the entire system, review those plans, and independently determine whether their respective component parts would function in a safe fashion." *Roberts v. Performance Site Management, Inc.*, 10th Dist. Franklin No. 03AP-784, 2004-Ohio-2820, ¶ 21, citing *Searls*, 29 Ohio App.3d at 311. The record demonstrates that this information was unavailable to JCI.

{¶ 43} The record demonstrates that JCI, as the manufacturer of the rear seat, manufactured its product in accordance with the specifications requested by Chrysler. Although the record demonstrates that JCI may have had some knowledge regarding the seatback's use as a barrier to cargo in the trunk, the record is clear that JCI had no knowledge regarding the vehicle's overall cargo retention system. As previously mentioned, it is undisputed that Chrysler could have chosen a method for cargo retention unrelated to the seatback. It is also undisputed that JCI had no control over the design and manufacture

of the vehicle. At the time this seat and vehicle were designed and manufactured, cargo retention was not a concern amongst the industry. Based on this record, we find that appellants have failed to prove that the rear seatback was defective due to JCI's failure to provide a warning.

{¶ 44} Having found that appellants failed to establish the rear seatback was itself defective, either in its design or due to inadequate warnings, we now consider whether JCI assembled or constructed the final product or substantially participated in the design of the final completed product.

**3. JCI Did Not Substantially Participate in the Design or Assembly of the 300M**

{¶ 45} As previously mentioned, under the component parts doctrine, a manufacturer of a component part is not liable due to defects in the completed product unless the component manufacturer assembled or constructed the final product or substantially participated in its design. *Romans*, 2013-Ohio-5089 at ¶ 50, citing *Wells v. Komatsu Am. Internatl. Co.,* 1st Dist. Hamilton No. C-040088, 2005-Ohio-4415, ¶ 12. Appellants do not contend that JCI participated in the construction or assembly of the 300M. Accordingly, in order to impose liability upon JCI, appellants were required to demonstrate that JCI substantially participated in the design of the 300M.

{¶ 46} Under the "substantial participation" exception to the component parts doctrine, a component manufacturer's liability depends upon the manufacturer's involvement and level of input in the design and assembly of the final product. Where there is evidence that the component part manufacturer played a direct role in designing the final product and installing and integrating its component into the final product then the manufacturer may be held strictly liable for the defect in the final product. *Romans* at ¶ 50, citing *Leibreich v. A.J. Refrigeration, Inc.*, 67 Ohio St.3d 266, 271 (1993); *accord Miles v. Kohli v. Kaliher Assoc., Ltd.*, 917 F.2d 235, 245 (6th Cir.1990). However, where a component manufacturer merely

consults with the assembler or manufacturer of the final product, liability cannot be imputed on the component part manufacturer. *Romans* at ¶ 50; *see also Acme Steak Co., Inc. v. Great Lakes Mech. Co.*, 7th Dist. Mahoning Nos. 98-CA-146 and 98-CA-243, 2000 WL 1506199, *3 (Sept. 29, 2000) (finding a component part manufacturer was not subject to liability where it reviewed design drawings and specifications but was not involved in the design or construction of the integrated system).

{¶ 47} Communication between the final product manufacturer and the component part manufacturer is a necessary part of the normal process of development as "[a] component parts supplier cannot be expected to operate in a factual vacuum when attempting to match its products to the needs of its customers." *Acme* at *3; *Romans* at ¶ 51, 56. Accordingly, a component part manufacturer's material participation in the design of the component part is insufficient to establish that the manufacturer "substantially participated" in the design of the final product. *Romans* at ¶ 56. Rather, "Ohio law requires the component manufacturer substantially participate in the design of the *final product*, not the component part in order to be held liable." (Emphasis sic.) *Id.*

{¶ 48} In support of their claim that JCI possesses liability in this case, appellants point out that the rear seatback at issue was not an "off the shelf" component part. Rather, this seat was specifically designed by JCI to be installed into the LH platform of vehicles, including the 300M. Consequently, appellants assert "JCI substantially participated in the design of the final product by designing a product to perform specifically for the integrated product." In addition, appellants emphasize that JCI substantially participated in the design of the 300M as a result of its frequent and regular communication with Chrysler. In particular, appellants note that JCI met bi-weekly with Chrysler, tested the seats for strength and durability, suggested design concepts, identified potential failure modes of the seating system, presented action plans for those failure modes, and also submitted a separate

"monthly report to Chrysler engineering listing the current twenty highest risk failure mechanisms."

{¶ 49} After a review of the record, we find that the communication between Chrysler and JCI did not amount to "substantial participation" in the design of the completed product. It is undisputed that JCI worked with Chrysler to design the rear seat assembly for installation into the LH platform. Seigrist explained, "as [Chrysler is] developing the vehicle they're providing us input and giving us guidance * * * based off of the statement of work of what content, what specifications—what we are required to do * * * in the design to meet * * * their requirements." In addition, Siegrist also stated that the periodic meetings between JCI and Chrysler were held "to ensure that [JCI is] meeting * * * Chrysler's requirements." Such interaction would be expected as JCI was developing and designing this seat for a specific platform of vehicles. This communication was necessary for the development process to ensure that JCI could meet the requirements of Chrysler, as JCI cannot be "expected to operate in a factual vacuum." *Acme* at *3.

{¶ 50} Moreover, it is apparent that these communications related to the design of the seat as a seat, and not the overall design of the 300M nor a design for Chrysler's system of cargo retention. As explained by Tighe, Chrysler only provided vehicle details necessary to ensure that JCI's seat would install properly into Chrysler's vehicles. For instance, JCI was aware of how its seat would attach to the body of the vehicle, but was unaware of other vehicle conditions such as the weight capacity of the trunk. There is nothing in the record which indicates JCI had any input or control over the design of the 300M. Rather, the record reflects that that Chrysler maintained control over the design of the 300M.

{¶ 51} Finally, appellants argue that JCI should be held liable based on JCI's material participation in the design of the rear seat. However, this court has already found that the material participation in the design of the component is insufficient to establish "substantial

participation" in the design of the final product. *Romans* at ¶ 56. Rather, Ohio law requires the component part manufacturer to substantially participate in the design of the final product, not the component part in order to be held liable. *Id.* It is undisputed that JCI made several design decisions with regards to the rear seat and the rear seatback. For example, JCI decided to utilize a push nut to retain the pivot pin into the 40 percent side. The two panels were joined together at this pivot pin. However, again we must emphasize that the record is clear that JCI's design was solely to meet Chrysler's specifications. In fact, Barrett testified that the overall parameters of the seat such as the cost target, the weight target, the minimum strength of the seat, and the 60/40 split design were all decisions made by Chrysler. Accordingly, although JCI had responsibility related to the seat's design, it is clear that JCI did not have the freedom to design any seat it wanted or otherwise change Chrysler's specifications. Rather, the seat's design had to comply with the specifications and requirements set by Chrysler. In addition, each of the tests and reports completed by JCI, which appellants argue reveal JCI's "substantial participation" in the design of the vehicle, were requirements set forth by Chrysler at the beginning of the parties' working relationship. On this record, it is apparent that JCI's concern and responsibility was to ensure that its seat met the specifications provided by Chrysler.

{¶ 52} Based on the foregoing, appellants have failed to present a genuine issue of material fact as to whether JCI substantially participated in the design of the 300M.

### III. Conclusion

{¶ 53} As appellants failed to present evidence establishing a genuine issue of material fact regarding whether the seatback itself was defective or that JCI substantially participated in the design of the 300M, we find that JCI was entitled to judgment as a matter of law. Accordingly, the trial court did not err in granting summary judgment to JCI. Appellants' sole assignment of error is overruled.

{¶ 54} Judgment affirmed.

S. POWELL, P.J., and M. POWELL, J., concur.